Good morning. May it please the Court. My name is Kim Kralowek. I represent Plaintiff and Appellant Katherine Robinson, who did not agree to arbitrate any claims against OnStar. California law does not recognize mail-it-later contracting of the kind that OnStar is attempting to impose on consumers. Under California law, silence or inaction does not equal consent to mail-it-later terms. And this is black-letter law under Windsor Mills, Golden Eagle Insurance, Norcia, and Schnabel. If it had been the husband who had called in to OnStar for whatever, 60 minutes of services and activated, would he have been bound to arbitrate? He would not have been bound to arbitrate. There was no document that was obviously a contract that he signed that said that he agreed to any terms and conditions whatsoever. If you look at the form that he signed, it is not called a contract. It is not called an agreement. If you compare that to the language... What is it called? It's called GM Customer Incentive and OnStar Acknowledgement. If you compare that to the language in Marin Storage, where a contract was found, it was called Work Authorization and Contract. And then right by the signature line, the document in Marin Storage said, This is a contract, which includes all terms and conditions stated on the reverse side. OnStar drafted this document. It would have been a simple matter for OnStar to use contract language such as agreement, contract, this is a contract. This document is not obviously a contract. Under Windsor Mills, where the document was called Acknowledgement of Order, that document was not found to be obviously a contract. And it was not binding on the party, even though it actually had all of the terms that the other party wanted to enforce printed on it. The problem with this form is two-fold. First of all, number one, it's not a contract. Number two, even if it were a contract, it did not adequately incorporate by reference the document that OnStar wants to impose on my client now. There are four elements of incorporation by reference, and this document does not meet any of them. It doesn't clearly and unequivocally identify the secondary document to be incorporated by reference. It doesn't match the actual title of the document that was up on the website and that was mailed later. It talks about the OnStar services, and it doesn't say I agree to be bound by the terms and conditions applicable to the OnStar services. It just says the OnStar services, and what does that even mean? Their own document, page 149 in the record, says services vary by model and model year. There's no indication of what services are being discussed here. Does it mean the free trial that my client signed up for? It says nothing about the free trial. Does it mean the minutes that she purchased? It says nothing about purchasing minutes. This document does not say I agree to be bound by a specific document called terms and conditions applicable to your OnStar services, which is what the secondary document is actually called, and that's enough. Those flaws are sufficient. You know, we don't even need to get to the third and fourth elements, which have to do with whether the secondary document was available or posted on some website somewhere. So no, Your Honor, Mr. Robinson, even someone who signed this form, would not be bound if they had called to sign up for the services. And the problem with the district court's order, Your Honor, the district court erroneously relied on an exception to the rule that silence or inaction does not equal consent. That does not apply in this case at all. What we have here is a situation where, yes, the district court said a contract was formed during the phone call. The terms of that contract were OnStar would provide a full year of free trial and would provide the cell phone minutes that my client purchased and paid for by giving her debit card number. Once that call, once they hung up, contract was done, contract was formed. My client's performance was complete at that moment. OnStar immediately began performing itself. It turned on the OnStar service. It gave my client access to the cell phone minutes that she had bought. And, in fact, she could have used up all of the cell phone minutes before this secondary document terms and conditions ever came in the mail. Under those circumstances, when the parties have already agreed to perform certain contractual obligations, mailing terms later is just an offer, and an offer that has to be accepted through something other than silence or inaction. The cases that OnStar cited in their brief, Acadia and Durgin, and this principle is also recognized in Gold and Eagle, say that if two parties to a contract, one of them later mails a proposed modification and the other party accepts the proposed benefits, that would be a modification. But my client did not accept anything further that was offered to her. All she accepted was the free trial and minutes that OnStar was already contractually obligated to provide. And there's a good reason for this rule. Any other rule could lead to significant abuse. For example, what if the terms and conditions had said, oh, by the way, our free trial, we're actually going to impose a $5.99 a month customer service fee. And if you don't cancel your free trial, we're going to bill that to your credit card. That type of contracting and that type of contract modification is not recognized under California law. If they had offered her, for example... Are you saying there's no difference between whether they had mailed that to the wife or to the husband? I would, Your Honor. Even someone who, yes, that is correct. Because it's still an offer to modify a contract that wasn't accepted because my client or Mr. Robinson, neither one of them accepted anything beyond what OnStar was already contractually obligated to provide. So, for example, in the Acadia case, where there were two adjacent landowners, one of them owned a well, one party, and there was a contract to provide water, one party sent a letter and a check saying, here's the additional money that I will pay you if you agree to maintain the water pressure at a higher level than our contract requires. The other party cashed the check, accepting the benefit that was offered, thereby working a modification of the contract. We don't have a comparable situation here. And that principle was part of the reason why this court in Norcia v. Samsung and also Dang v. Samsung held that an in-the-box contract is not enforceable under California law because nothing was offered to the plaintiffs in those cases than what they were already contractually entitled to. They bought a phone. They get to keep the phone. They don't have to return the phone because there are terms in the box.  Where the bank tried to change the terms of the existing contract with its customers by enclosing a bill stuffer. And the bank said, well, you didn't cancel. You should have canceled if you didn't like this arbitration clause. The court of appeal held, no, the customers don't have to cancel their service in order to get out of this term being, this unilateral term being imposed on them. That was also the rationale of the Douglas case decided by this court. So the exception that the district court relied on simply does not apply. And I wanted to talk also about the Knutson case, which is what the district court, one of the cases the district court cited was Knutson. The other one was the district court case called Bischoff. And Bischoff has been unfortunately cited in a series of other cases, including not only Knutson but also Murphy. Also another district court case called Lozano v. AT&T, which was cited in Knutson. But the problem with Bischoff is, first of all, it's not binding. But secondly, it heavily relied on a case called Hill v. Gateway, which was a Seventh Circuit case that held that in-the-box contracts are enforceable. And in Norcia, this court carefully examined Hill v. Gateway and considered the argument that in-the-box contracts should be enforceable. And in Norcia, this court held that Hill v. Gateway does not reflect California law. So this line of authority that sort of developed based on Bischoff is completely contrary to Norcia. And the district court didn't have the benefit of Norcia at the time the order was handed down. Norcia was decided later. But it's very clear that the reasoning of Bischoff, which was cited in Knutson, does not accurately reflect California law. You probably want to save two minutes or so for rebuttal. So maybe you want to get on to your other theory that even if the husband would be bound, that the wife isn't? Well, certainly, Your Honor, she did not sign the acknowledgment form. And the district court did not rely on the acknowledgment form in finding a binding contract. The district court relied solely on the fact that she called to activate the service and then the terms were mailed later. And I believe I've just discussed extensively why mailed later terms are not enforceable in circumstances like this. The cases are very clear that there has to be some kind of notice during the initial interaction. The party has to be confronted with the terms at the time that they are agreeing. And there was no mention of any terms and conditions of any kind during the telephone conversation during which the services were activated. Do you want to save the rest of your time? I think I will save the rest of my time for rebuttal, Your Honor. I was going to submit on unless the court has any questions about the unconscionability issue, I'm prepared to submit that on the papers and I'll reserve the rest of my time. Thank you. Thank you. Good morning, and may it please the Court. Michael Brody on behalf of Defendant Onstar. As counsel indicated, this is a case about contract formation. And the district court correctly found, based on an evidentiary hearing, that the parties formed a contract that included the Onstar terms and conditions. One of the terms is an arbitration clause. Whether this matter is itself within the arbitration clause is not in dispute. So the parties are in agreement that the contract was formed when Ms. Robinson made the phone call to Onstar to sign up for the subscription service, right? We contend the initial contract was formed at that time, correct. And at that time, was there any discussion or did anybody alert Ms. Robinson to the fact that additional terms and conditions would be mailed to her later? I don't think the trial testimony indicated that, Your Honor. She indicated that it was not disclosed to her in that telephone conversation. So if it wasn't disclosed, how can she be on active, I mean, actual or even constructive notice of the fact that there were additional terms and conditions if the contract formation had occurred at the time of the phone call? I'm sorry, Your Honor. That was not the first interaction between Onstar and Ms. Robinson. The initial interactions began when they purchased the car several days, two days earlier. Did she sign the acknowledgment or did just the husband sign the acknowledgment? The husband signed the acknowledgment, but the testimony that the trial court heard was considerably more detailed than that. The testimony indicated that the reason she did not sign the document was a matter of family dynamics. This was her car. It wasn't his car. It was her car. She was involved in the decision to purchase it. She test drove it. She shopped for it. She negotiated. She was involved in the decision to lease. Well, where are you getting at? Even though she didn't sign it, she's bound by it, right? No, Your Honor. Is that your point? No, our point is that. What difference does all that make? She was sitting next to him, you know, right? She looked at the contract or the acknowledgment, right? She saw him sign it? Correct, Your Honor. Our position is that at the initial meeting on December 15th when the husband signed and the party stipulated, he read and understood the document. But what does that have to do with her and the contract between her and Onstar? It's two separate parties. Yes, they're married, unless you're saying that by virtue of the marriage, somehow she's imputed with the knowledge. So what difference does that, those circumstances have to the contract formation during the phone call with Ms. Robinson? Because unlike the other cases that are cited, for example, Norcia, Mrs. Robinson knew that this was a contractual situation. She knew that an offer had previously been made. Well, she knew it was a contractual situation between her husband and the dealer. No, Your Honor, I think she understood. No, she was bound. How could you know that? I wouldn't know that if I were sitting there. Well, she was present and the trial court found, witnessed and was aware her husband had received these terms. Right. I mean, if he were sitting there, would you be bound? In the circumstances of this case, yes, Your Honor. As her attorney, you would be bound? Oh, no, I'm sorry. I thought you meant if I was one of the contractual parties. You mean if you were her husband, you would be bound? Well, I think there's no question but that the husband is bound in this case. Well, what are you depending on? Like California community property law or what? No, Your Honor. What principle brings that into animation? Our position is on December 15th, an offer was made. Mrs. Robinson received that offer and understood that the offer was to be accepted by pushing the button in the car and activating the service. Two days later, she did so. That's why I asked you when the contract was formed between Ms. Robinson and OnStar, and you said it was when the phone call was made. So during that phone call, when she signed up for the subscription, are you now saying that the offer was actually originally made when her husband signed the acknowledgment, the offer was made to the both of them? No, Your Honor. Let me just be blunt and tell you what our position is. On December 15th, when the two of them sat there and the terms and conditions were described to them, the acknowledgment was presented to them, which explicitly referenced the terms and conditions. An offer was made. That constitutes an offer, not a contract. When Mrs. Robinson then, two days later, pushed the button, she accepted the offer because she was advised to activate the service, to engage in this contractual relationship, you push the button. She did that. That constitutes the contract. That initiated a process. When pushing the button, the operator came on the phone on the other side, and she discussed the additional minutes. But it was the pushing the button that constitutes the acceptance of the previously communicated offer. So if Mr. Robinson had pushed the button, it would have been exactly the same? Yes, Your Honor. I believe there would be no question in that case because he was he has stipulated that he understood the terms. I'm concerned about what is the effect of the material that was in the box. What does that have to do with the outcome of the case? Well, I'm going to change gears a little on this. I first don't think this fits really within the terms within the box cases. Plaintiff relies on the Norcia case. And I'd like to talk about that for a moment. In Norcia, the plaintiff, Norcia, had a communication with Verizon, a cell phone provider, and entered into a contractual relationship with Verizon. There's no question but that there was a contract with Verizon. She then received a Samsung cell phone. She took it home, and Samsung contended that buried within the warranty was a contract that she was  And this Court said, no, there was no reason for her to understand that the relationship with Samsung was contractual, that it was freighted with contract terms, just like in the Knudsen case where the plaintiff, I don't know if it was Mr. or Mrs. Knudsen, took possession of a Toyota automobile, had a contractual relationship with Toyota, and then Sirius XM tried to say, oh, we had a contract, too. And this Court said, no, there was no contractual situation. This case is very different in that context. Because when the Robinsons sat across the table from the Cadillac representative and received the GM acknowledgment, which says, I acknowledge that I have received the terms and conditions, sounds like contract, applicable to this service, it was very different than those other cases. It was explicitly freighted with contract. So in that initial conversation, she understood. She's a sophisticated consumer. She's a lawyer. She understood that she was entering into the world of contract. And at that point, she received an offer, which when she pushed the button, she accepted. Now, what were the terms when she accepted that offer? The plaintiff's contention is, well, the terms are, we give her 12 months free service and there's nothing else. Our contention is that when she accepted, they contend a contract was formed. When that contract was formed, what were the terms? Under California law, where terms are made available to you even if you do not read them, they become part of the contract. So our first contention is that when she pushed the button and accepted the terms, knowing that it was in a contractual context, she was accepting a contract offer. But let's turn to the mail-it-later argument. And let's just address the facts on this a little bit. She pushed the button on December 17th. On December 19th, GM mailed to her a welcome kit. We know that she received it because she produced the enrollment card at the hearing. We know that she received the terms and conditions. She also produced those at the hearing. And the trial court found that her explanation that, no, I got it from my leasing company, was not credible. The court found she received the terms from us. And this is just a matter of days after she pushed the button. The charges she complains about didn't start for another year. And in that year, OnStar sent her a series of additional communications. The trial testimony reflected this, advising her of the terms. And shortly before the charges were initiated, they sent her another communication saying, oh, by the way, you're about to get charged unless you cancel. Okay. So that's what happened here. Why is that relevant? Well, the plaintiff contends that there was this bare-bones contract formed on December 17th when she pushed the button. On December 19th, we mailed to her the terms. And the terms say, these are the terms going forward. If you do not reject them in 30 days, she had a time period to reject them, you're bound by them. And it fits within the cases decided by the California courts. And this Court that provide the retention of benefits after the receipt of explicit contractual terms constitutes an offer, an acceptance of an offer. So the mailing of the terms, if they were not already part of the contract, constituted an offer to modify, which she accepted through retained benefits, retaining the benefits. That's what Judge Wynn, I believe, Your Honor, held in the Murphy v. Direct-TV case, which this Court affirmed, and the facts were very similar. A later mailing, subsequent communications, no question of a contractual relationship, and the Court found that to be sufficient. Now, the argument we hear today, and I don't mean to be dismissive, the argument they make in their brief is that there's no consideration, there's nothing to support that because she was already bound. I invite you to look at the terms of the OnStar terms and conditions because they are mutual. They don't just bind plaintiff to arbitration. They bind OnStar to the provision of a particular type of service, putting meat on this prior statement that previously, they say, just was a promise of some free service. And in discussing the arbitration clause itself, they are very mutual. They provide not only must the plaintiff, in this case, arbitrate, but that OnStar must arbitrate. The arbitration clause, was it contained in the material in the box? It was mailed to her, yes. There was no box. It was mailed to her two days after she pushed the button. Okay. But what he acknowledged receiving, when he signed, I acknowledge, is in the glove compartment that there is material. Was an arbitration clause there or only in the one with mail? There's always been an arbitration clause. I have to concede the testimony at trial was there was not a clause, not a copy of the terms and conditions in the glove box. A mistake was made. But the terms and conditions were available to the Robinsons. They were available on the website. The testimony at trial indicated that they were available there and always available there. And Mr. Robinson, in lieu of testifying, stipulated that he read and understood the acknowledgment which said, I acknowledge I have received the terms and conditions. Copies are available in my glove box. Incorrect. But the copies are also available online, and they were. So, yes, they were always available. Well, that would certainly bind, under these facts, Mr. Robinson. The question is, how does that extend to Mrs. Robinson, right? Yes, Your Honor. I think for two ways. First, it binds Mrs. Robinson when she pushes the button, knowing that she's operating in a world of contracts, and knowing because she sat next to her husband. Even though she doesn't know what's in the contract? She does not, even if she did not know. Yes, Your Honor. She's not required. When I say know what's in the contract, I mean know that there's an arbitration clause. That's correct, Your Honor. As I understand California law, a party is bound to terms, even if they did not read them, as long as they're the sorts of things they had an opportunity to review. And we contend she did. But even if she didn't, on December 19th, two days after she pushed the button, we mailed the terms and conditions to her. They provide that they are to be to go into effect upon continued retention of the benefit. She continued to receive the benefit. Is what you mailed to her the same as what was in the glove compartment? Yes, Your Honor. The testimony from Mr. Festa was, and he was the person responsible. It wasn't in the glove box. It was on the website, Your Honor. I thought there was something he acknowledged was placed in the car. His acknowledgement said, I acknowledge that there are terms and conditions and that they're available to me in the glove box at the dealer or on the website. And we were unable to prove they were in the glove box. I see. So what you're relying on is that he said that he knew that there were terms and conditions that were available somewhere. Correct. And she didn't sign that. But those same terms and conditions are what was mailed to her. Yes, Your Honor. So if they had been mailed to him and he hadn't signed any acknowledgement that he knew they were available, your position is that a contract was entered into regarding those specific things when he received them in the mail? Yes. Receipt of the terms, if they had been mailed to him, receipt of the terms and continued receipt of the benefits constitutes offer and acceptance. And the testimony here at trial was that they were mailed to Katherine Robinson. And the only difference between him and her is that he was told in her presence that the terms and conditions could be found on the website? Yes. The plaintiff stipulated that he read and understood those terms, yes. And I don't want to get away from her role in this. There was testimony as to her involvement in the purchase of the automobile, which was to be her car, the lease of the automobile, and the trial judge found that the plaintiff tried to exclude the evidence of the husband's participation in this, and the trial court found that it was indeed relevant that he had signed this form and that she was next to him at the time it was signed. I think it's a recognition by the trial court that the trial court thought that was relevant to her which she accepted by pushing the button. So our position simply is we have offer and acceptance. The initial offer reflects the terms and conditions which were referenced in the document, and they were accepted by Mrs. Robinson when she pushed the button. Alternatively, days later, a matter of two days later, Onstar mailed the terms and conditions to Mrs. Robinson, which she retained until this day, and she retained throughout the time period relevant to form a contract. I see my time has long passed, but if the panel has any other questions, otherwise I'll rest on the briefs. Thank you. Thank you, Your Honor. This acknowledgment form is not an offer for a contract. It does not use any contractual language. It does not say that a person who signs it will be bound to any contractual terms. The document doesn't say that if I sign up for a free trial, I am agreeing to be bound to terms. It does not say if you push the button, you'll be agreeing to be bound to terms. Knutson says that a party cannot be obligated to act where there was no effective notice that action was required. Schnabel says that during the initial interactions with the defendant, notice of the possibility of future amendments to the contract was not given. This document does not say that any terms will be binding. And I will submit that because they elected to include, Onstar elected to set this up, to include the arbitration clause in a secondary document, it's not in this document. It's in a secondary document. And when that's the case, the four elements of incorporation by reference have to be satisfied. This, and one of those, the most important one, is consent to be bound using wording such as I agree. There's no such wording in this document. And Onstar easily could have dropped it to that one. Kagan. That acknowledgment really wasn't the basis of the district court's analysis was it? That's correct. It was not, and I bet I wanted to. The district court basically focused on the fact that the terms and conditions that were mailed to her after that contract had been formed, you know, via the discussion with Onstar. That was the notice, the terms and conditions. Correct. Was this issue discussed for this theory discussed below that the original offer was made to both husband and wife and by pushing the button she accepted the offer? Onstar relied heavily on the acknowledgment form and the fact that Mrs. Robinson sat next to her husband when he signed the form. But no one argued that they were ever told that pressing a button meant you agree to be bound contractually by terms. And those were not the facts. They were not. No one at the dealership, nor does this document say, that if you press the button to sign up for the free trial or to buy cell phone minutes, you will be bound by unknown terms and conditions that we haven't provided to you. I mean, it's their duty to clearly identify. But doesn't the acknowledgment form mention somewhere about pressing the button? It does not. Huh? It does not. Nothing in there about pressing the button? Nothing about pressing the blue button. Nothing about a free trial. Nothing about cell phone minutes. All right. But in any case, she did press the button and what, about a week later, the terms and conditions came, right? They did, but. And then she could have said, well, listen, this is not what I expected when I pressed the button. I want to get out of this. She could have said that, but she didn't, did she? She was under no obligation to do so. And here's an additional reason why. First, under the law, under Bay TV Bank of America. Was that her position? She said, well, these are the terms and conditions, but I know I'm under no obligation to accept them. So, you know, I just throw them in the wastebasket? Is that her position? She didn't even read. She has no memory of receiving or reading the terms and conditions when they came. And here's another reason why she should not be bound by mail of later terms. If you look at the cover letter, the transmittal letter that OnStar says was enclosed with the booklet, it's page 148 of the record. It does not say. The mail booklet or the glove compartment booklet or both? There was no booklet in the glove compartment. That statement in this form, that it's in the glove box, was false. OnStar knew it was false. That would send you on a wild goose chase if you were looking for terms and conditions in the glove box because they were not there. Nor were a copy given to Mr. Robinson at the time that this was signed. So that's another false statement in the document. And the statement that the terms are, quote, unquote, available on OnStar.com, we objected to the website evidence as hearsay and inadmissible because they failed to produce any evidence of what the website would have actually looked like. But setting all that aside, the missing key here is it does not say I agree to be bound. It's not obviously a contract. And the letter that, the transmittal letter that they mailed later also, it does not say enclosed are important contract terms. You must cancel your free trial or you will be bound. It gave no notice that any action was required. And the case law is clear. It has to be not just. When you say it, you're referring to the cover letter. I am referring to the cover letter. But what about the terms and conditions themselves? The terms and conditions themselves. So, Your Honor, they're folded into a booklet like this. I know, but there's nothing in there? With the front page. There's nothing in there about canceling? It does not, it literally does not say that in the first paragraph. It only says that if more terms are mailed to you. Not in the first paragraph? On the first page. So what are you saying? It has to be in the first paragraph? Well, it needs to be prominently, clearly notified that inaction or failure to cancel will be binding. And the reason I say that, and I want to emphasize what's on the front cover of this, including a cover letter that does not tell you these are contract terms and that does not say you must cancel your free trial or you will be bound. In Long Beach Provide Commerce, which is the California Court of Appeal, the Court of Appeal specifically said that this was a website case, but the same principle applies. Even if you have a prominent or conspicuous hyperlink on the web page with the phrase terms of use, and that's, you know, they say terms and conditions, whatever that means, with the phrase terms of use, without notifying customers that the linked page contains binding contractual terms, the phrase terms of use may have no meaning or a different meaning to a large segment of the Internet using public. The burden is on OnStar to give customers notice that their actions or inactions will have consequences. And they did not do that in the acknowledgement form. They did not do that in the cover letter that came with the booklet. They gave these customers no reason to even open the booklet. This whole setup was designed to reduce the likelihood that customers would notice and object to the terms. That's a quote from Bay TV Bank of America. There simply was no contract formed under California law in this case, regardless of whether we're talking about Mr. or Mrs. Robinson. But I just have one thing clear, because I'm not as confused by the answers. What did the district court find as to whether there was a booklet in the car? The parties stipulated that there was no booklet in the car, that OnStar's practices had changed and they no longer put a copy of the booklet in the glove box. Then what did the acknowledgement acknowledge? It acknowledged a bunch of things that OnStar didn't actually do. It said, I acknowledge that you gave me a copy of the terms and conditions, which they did not do. No terms and conditions were given to Mr. Robinson. No booklet given to him. Okay, but they acknowledged what? Knowledge of he was told it was on the website? It says, I acknowledge that the OnStar services, I'm sorry. It says, I acknowledge that I have received the terms and conditions applicable to the OnStar services. Well, that wasn't actually in the stack of documents when he was signing the lease. Then it says, copies are available in my vehicle glove box. Okay, that's a false statement. OnStar changed its practices and didn't do that anymore. From my dealer. Well, the dealer didn't give them a copy of the booklet. Or at www.onstar.com, which the terms and conditions were not actually available at that website unless you scrolled down and enlarged the page and saw a little tiny link at the bottom of the webpage right there. That's the link you would have had to scroll down and see. So it was in effect that the terms and conditions were on the webpage? They said that the terms and conditions were at OnStar.com, which is not the webpage where you would actually find them. You would have to scroll down, enlarge, find a submerged link. And, Your Honor, the document does not say, I agree to be bound. And that is critical. That's outcome determinative. If the document does not say, I agree to be bound by the secondary document, it doesn't matter if it was online or if you were even given a copy. I just want to know what was acknowledged. Acknowledged that the terms and conditions, what, I acknowledge what? It says, I acknowledge that I have received the terms and conditions applicable to the OnStar services, which he actually did, it was not in the stack. You know, when you go into Lisa Carr's big stack of documents, the terms and conditions were not given to him. And OnStar admitted that that was not part of their normal practice at the time, to have the dealer give a copy of the terms and conditions. Under those circumstances, what they should have done was have their agent on the phone call say, there will be terms and conditions applicable to this contract, and you must go to our website and sign and indicate your affirmative agreement. We know that was feasible because that's how they changed their practices later. Thank you. I was just trying to find out what the facts were. Does that answer your question, Your Honor? Because I'm reading from page 120. It more than answers the question. Okay. Any other questions? Thank you. Thank you very much, Your Honor. Okay. Thank you both very much for the argument.
judges: Reinhardt, Tashima, Nguyen